22-1285 Stenson v. Edmonds. Counsel for the client, if you would make your appearance and proceed, please. Good morning, Chief Judge Holm, Judge Carson, Judge McHugh. My name is William Sultan and I represent the appellant, Sean Stenson. We come before you today because the inconsistent and categorical decisions by the district court in this case were arbitrary and capricious and meet this court's standard for abuse of discretion. This case arises out of a car accident between the appellant, Sean Stenson, and Keith Edmonds, who was hauling a semi-truck for Cargill Meat Logistics. In this case, the district court found that Mr. Stenson had failed to comply with a court order compelling the production of pre-accident medical records as well as financial records. The court, in so finding, also applied Rule 37 sanctions to Mr. Stenson, awarding attorney's fees and costs to the appellee's attorneys. The district court went further than that, however, and relying on its inherent powers, decided to sanction Mr. Stenson by dismissing claims for physical pain and suffering and emotional pain and suffering, and also imposing a limit on Mr. Stenson's evidence at trial with respect to economic damages. The district court did this on the grounds that the district court could not rely on Mr. Stenson's testimony alone. But indeed, evidence for physical pain and suffering as well as emotional pain and suffering could have been verified by medical records, similar evidence which the court relied for economic damages. And so we submit that a lesser sanction should have been applied. Let me ask you this. On the sanctions issue, discovery sanctions issue, the legal framework that governs that essentially is the one articulated in Garcia and the Ehrenhaus factors. Isn't that right? Well, Your Honor, I believe that this case is distinguishable from Garcia and the Ehrenhaus factors because in Garcia, the court specifically found that the appellant had lied under oath. That was not a finding that was made in the district court's decision in this case until December of 2022, long after the case had been dismissed. Well, two things. One, did you even talk about Garcia in your opening brief? It was not cited in the appellant's opening brief, Your Honor. Okay. And isn't that framework, and I'm talking now, I'm not saying the holding maps onto this case and that they're factually opposite. I'm just talking about isn't the legal framework that's articulated in Garcia, the Ehrenhaus factors analysis, isn't that the one that governs this whole question of discovery sanctions or not? It does discover, it does govern the court's use of its inherent powers. That is correct, Your Honor. Yes. Well, if it does, then why didn't you argue under that framework? In other words, I'm trying to struggle to understand how we're situated to give you relief if you aren't making an argument under the controlling legal framework that governs here. Yes. Your Honor, what we submit to the court and what we argued in our brief is that the court should have relied on Rule 37 sanctions, not its inherent powers. And so from our position, we believe that the court should not have used its inherent powers to levy a sanction at all. But in deciding to levy its sanction using the inherent powers, that there were lesser sanctions that could have been efficacious under the Garcia and Ehrenhaus factors. And that would have been consistent and addressed the district court's concerns about Mr. Stenson's veracity. And the district court did that with respect to the economic damages requiring a different evidentiary standard to admit medical bills. Similar medical records could have been used to corroborate Mr. Stenson's testimony about physical pain and suffering and emotional pain and suffering. And so we believe that it was unnecessary for the court in this case to use its inherent powers, which this court has held should be used sparingly. Do you think that the conclusion that his evidence should have to be corroborated as a sanction was erroneous? Yes, I do. We believe that the court... Yeah, I believe the district court's discussion of its Rule 37 sanctions awarding fees and costs was the appropriate sanction in the case. It's undisputed on appeal that Mr. Stenson failed to comply with a court order. Rule 37 provides a sanction for that. The standard sanction for a failure to abide by a motion to compel order is attorney's fees and costs. But he did more than that. He also falsified his employment records, right? There was testimony in a March 2020 hearing that Mr. Stenson had falsified four checks. The district court made a finding that he had falsified them and that it was fraudulent, right? The district court made a finding that the checks were falsified. That's true, and that was undisputed at the March 2020 hearing. But I think the context of that is important. So pre-suit, Mr. Stenson submitted four checks to his attorneys. Those checks were not produced pursuant to a document request by the appellees. They were produced in an eighth supplemental disclosure under Rule 26A1. And so I think that context is important. Why does that matter? I mean, you're producing false documents to try to gin up your damages. Obviously, the court has some concern about that. Not only is that a fraud on the other party, it's a fraud on the court, isn't it? No, I don't believe that it is, Your Honor. So just so we're clear on what the history is, the four checks were not submitted as a part of the original initial disclosures, the first seven that were submitted. They were never submitted as part of a document request. They were never submitted as a part of an interrogatory under oath. It was something that was submitted much later in the game. And to be quite honest, I haven't had discussions with prior counsel as to why those checks were even submitted. But what the district court found was that those checks were submitted to Mr. Stenson's own attorneys, and that that was a lie to Mr. Stenson's own attorneys. Not that it was a specific fraud on the court or that it was specifically used outside of pre-suit demands. If it were, if they, well, submitted to his own attorneys with the, it seems to me, apparent belief that his own attorneys would act on them, right? No, Mr. Stenson's testimony at the March 2020 hearing was the exact opposite, that it was never his intention that those checks would end up in court. And I think the history bears that out as the lawyers never submitted that as part of any response to any discovery request or the original first seven initial disclosures in the case. So he just produced his false documents for no reason? No, I believe he, I believe the testimony is that he produced those to support a statement he made to his lawyers about what his lost earning capacity was. Well, he's expecting his attorneys to act on that statement, right? Yes. All right, well, he's provided support so his attorneys can feel comfortable going forward and arguing for a statement that has no foundation in fact, because he falsified the foundation for it. Well, the four checks that we're talking about, Your Honor, relate to only a part of the evidence that Mr. Stenson produced to his attorneys to support his lost income. It's a false part. That's correct. And he asked for $28 million in damages. I mean, it's obviously goes to what he hoped would be the calculation of the damages here. That is correct. Let me ask you this. I mean, what about our decision, it's Archibuque there, there was no warning. And we upheld the district court's decision to dismiss the entire case and award fees for falsifying discovery responses. How is your case, why should we be more lenient here? Why did the district court err here? I believe there's a distinction between Archibuque, Garcia and those lines of cases because those are statements made under oath. And that is not the case here. We're talking about checks that were submitted pursuant to a Rule 26A1 initial disclosure. That was something that Mr. Stenson admitted to at a March 2020 hearing under oath. It was also something that he admitted to in depositions. So this was not a situation where he had made a false statement under oath. And that was not the finding of the district court until December 23rd, 2022. What about the medical history? There was a discovery on that, wasn't there? There was discovery on medical history and the district court found, and we're not challenging that on appeal, that Mr. Stenson failed to disclose a complete history of his medical records in violation of a court order compelling him to do so. And the court awarded Rule 37 sanctions associated with that. The court also ruled later in motions in Lemony that notwithstanding that case history, that Mr. Stenson could still testify about spinal pain and that history. And the reason for that is that that could be corroborated by Dr. Ross-Sherbin and others. And so that was part of the district court's calculation as it relates to the prior medical history. Well, that's consistent, though. Your position that he should be able to testify as to damages without corroboration, what's the corroboration for that? The corroboration for physical pain and suffering and emotional pain and suffering is essentially the same as it was for the economic damages medical records. And we believe— I know, but the medical records, I mean, he has a history of falsifying documents. So we can't just let him shove in any kind of document he wants, can we? Don't we have to have some indication that the document's true and accurate? Well, sure, but the documents in this case that we're talking about are medical records and medical billing records sourced directly from the providers. I know, but those usually come with a properly stated affidavit or a record custodian to testify as to their veracity. Ordinarily, the medical records and medical billing records would come in pursuant to a certification that they were true and accurate, certifications that were available in this case. Ordinarily, you would not have a record—it hasn't been my experience that you'd have a records custodian testifying as to records that really aren't in dispute. But when you're using a certification, you have to give reasonable written notice and a fair opportunity to challenge. And here, the certification was provided on the eve of trial. The certification provided by Mr. Stenson was produced on September 9th of 2022 pursuant to the district court's order for a hearing. But that doesn't mean that was the only time that certified medical records were produced to the defendants. The defendants had never challenged the untrustworthiness of the medical records. The issue was whether the district courts required a records custodian to testify. I'll reserve the balance of my time. Your Honors, good morning. May it please the court. Chris Castellaro appearing on behalf of the Appellees. I'm also joined by my co-counsel, Isaac Smith. There are a couple areas that I want to clarify that just came up in questioning with Appellant's counsel. First, I just want to highlight the fact that there was a lot of discussion about the interlocutory sanctions order. But at the conclusion of this case, this is a case that, and really an appeal, that involves Sean Stenson manufacturing a fraudulent lawsuit and the fact that he got caught. The district court found at the conclusion of the case on a voluminous and essentially undisputed factual record, that Mr. Stenson manufactured his claims in bad faith. He manufactured, or rather, he filed this lawsuit in bad faith and then he sustained the lawsuit through continuous fraudulent misconduct. And some of that has been discussed, but I guess to summarize, he fabricated evidence, concealed material evidence. He did make misrepresentations under oath, which I'll discuss in a second. And he made misrepresentations to his own attorneys and his own doctors in order to manufacture this lawsuit itself. Now, Mr. Stenson appeals three of the district court's orders and I will talk about them very briefly and I'll go through them chronologically. But to be clear, they do all circle back to his bad faith. I'd like you to give us now instead of later what statements he made under oath that were false. Several. So there were interrogatories that were served on Mr. Stenson and in those interrogatories he was asked about his medical history and he answered that he had no medical history. He was asked in a different interrogatory specifically if he had had any issues before the accident with his back or with his neck. And he said no. That was patently false. There are actually more than that. We asked in interrogatories whether he had any criminal history. He said no. We asked if he had any civil litigation history. He said no. Those were also patently false. And so all, at least four of those, I believe I could probably show you another two or three at least, all of those were false and they were sworn interrogatory responses. As to the initial disclosures and the issues of the checks, just to make a correction, the checks were produced with the very first initial disclosures. They were in the case from the very beginning. And I would also point the Court, if it needs some additional assurance, to page 9 of the Apolli's brief, which actually cites to a communication that Mr. Stetson sent to his trial counsel during this case, in which he said he wanted them to pursue lost wages for $4 million. And that was with the checks at that time still in play. So the notion that he had no intent to use the checks to defraud my clients is simply untrue. And it's certainly defied by a wealth of evidence. That's far from the only piece of evidence that shows he intended to use them to extract, you know, a fraudulent settlement or a fraudulent judgment. So I can talk really quickly about each of the orders and why they're sound. And I'll start with the District Court's June 2020 interlocutory order. As Your Honors have specified, Garcia is what governs that order. Mr. Stetson doesn't dispute that he falsified evidence. And in Garcia, this Court recognized that the falsification of evidence entitles a District Court to sanction a plaintiff,  The fact that the District Court didn't completely dismiss the lawsuit, as it could have done, speaks only to the fact that the District Court was cautious and conservative in exercising its discretion in sanctioning Mr. Stetson. From our perspective and what we argued, that should have been dismissed. What about his opposing counsel's suggestion that the Garcia framework really isn't the applicable one? I think he made some point about the fact that that relates to inherent authority and that is not what was that issue here. Well, again, Garcia, the District Court specified that Garcia is what would govern. The District Court said that before it made that determination. Oh, I get that. But was the District Court wrong in doing that is the point. Absolutely not. Garcia is clear. It talks specifically about the falsification of evidence. That's the premise for Garcia. There were later lies under oath, which by the way, we also have. So to the extent that that's relevant, we just talked about, you know, there's ample evidence of that too. But again, he doesn't dispute that he committed the conduct that Garcia said entitles a District Court to sanction a plaintiff. If the court is going under sanctions under the discovery rule, can it also have sanctions under its inherent powers or are they mutually exclusive? No, it can. And if I recall right, I think the District Court actually exercised its powers under rule 37 to sanction Mr. Stinson for failing to comply with the order compelling him to produce documents. I believe the dismissal sanction came in the context of its inherent authority, but I believe that the District Court's order itself actually demonstrates that you can exercise both. I'll talk next about the second order very briefly. This is the dismissal order of September of 2022. Perhaps consistent with the fact that this lawsuit didn't have a good faith basis to begin with, Mr. Stinson had no provable damages to send to a jury. Now, Mr. Stinson doesn't dispute that he was obligated to authenticate the medical bills that he sought to use to recover medical losses, or at least alleged medical losses. Nor does he dispute that the medical bills were hearsay and that he was obligated to establish an exception to the rule against hearsay. He argued that he should have been able to authenticate the medical bills and that he should have been able to somehow overcome the rule against hearsay. There's no authority for him to do that. But there is authority for using a certification under penalty of perjury. That is true. And no requirement that it be notarized. That's true. There, for the reasons that Your Honor discussed, that certification suffered from significant infirmities and certification wasn't available to Mr. Stinson in this case. There was no reasonable written notice made, nor under 803, was there any indicia of trustworthiness in that certification. This is a certification that showed up the day before trial. It was a document that isn't even what it purports to be. It's called an affidavit. It has a notary line, as an affidavit would need. It's not notarized. Upon its face, it's not what it appears to be. It's from a witness who does not appear anywhere in the records, was never disclosed at any point throughout this case, wasn't put on a witness list. This document never showed up in any of the exhibits, not in the final exhibit list. There is no assurance that this is a legitimate document. Certainly, we would have had no opportunity to challenge whether it was a legitimate document or investigate whether it was a legitimate document. And I would also say that given the degree of fraud that the court had seen in this case, it was entitled to require independent corroboration for Mr. Stenson for any of the damages that he sought to pursue at trial. And he just didn't have any. And so the court was correct in really just enforcing what the rules of evidence and what the law of the case already demanded of Mr. Stenson. It's just that he couldn't meet it. So it would be your position that just like cases where a trial court may not abuse its discretion by relying less than the letter of the rule requires, a trial court may not abuse its discretion by requiring more if the circumstances require it. Perhaps, but I think in this case, the court didn't necessarily require more than what the rules of evidence required. I understand that's your position, but let's assume that he did require more. I think under these extraordinary circumstances, yes. Although, again, because it's our position that 902 and 803, 6E weren't available in the first place, that issue is rather moot. Finally, I want to just quickly address the district court's attorney fee sanction at the conclusion of the case in December of 2022. That was based on a finding, again, a luminous record that Mr. Stenson had brought this case in bad faith, sustained it in bad faith. Mr. Stenson, again, does not appear to really dispute. That was me. I apologize. Mr. Stenson doesn't really appear to dispute the factual underpinnings of that decision. Disputes the conclusion, but the underpinnings are there. As I understand the argument, it's that there was this bad faith in the beginning. There was a change in counsel. From that moment forward, there was no additional bad faith or inappropriate conduct. So the court shouldn't then have come in and sanctioned when there had been nothing new, if I'm understanding the argument correctly. Yes, Your Honor. That is the argument that the plaintiffs made in their opening brief. There are several issues with that argument. First is that it's a false premise to start with. The district court, in its interlocutory order, warned Mr. Stenson that if he continued with this lawsuit and the court saw evidence that he had brought this lawsuit in bad faith, then it would award full attorney fees for the defendants. He was on notice years before this order came that the standard was whether he brought the case in bad faith. There was no opportunity to cure a case that's fraudulent at its root. Nor was that the basis for the court's decision in the first place when it made this award in December of 2022. It found that he had brought the lawsuit in bad faith. Whether an attorney joins midstream has no bearing on the legal analysis, and whether he began to stop committing fraud at some point in this case really has no bearing on the case, nor is it factually accurate. The district court pointed to at least three different ways that Mr. Stenson continued to commit fraud even after he was sanctioned and after the entry of his new counsel. Was his doctor's opinion that the accident caused his injury infected in any way by the medical history he provided that said he hadn't previously had any neck injury or back injury? Fundamentally. During his deposition, Dr. Shcherban testified that he relies heavily on a patient's history in order to make a causation determination, and the medical history that he was given by Mr. Stenson was false. And it continued to be false even after the sanctions order. That was one of the areas where the district court pointed that Mr. Stenson continued to commit fraud after he was sanctioned. He still went to Dr. Shcherban, I think it was about a year and a half, after the court issued a sanctions order, and he still made misrepresentations about his history to Dr. Shcherban. And what are the other two? You said there were three ways in which he continued to commit fraud. The other two were that he sort of concocted these new theories that had no good faith basis at all to adapt to the fact that we had discovered that his initial theory was false, which was that he had no prior injuries, this accident happened, and then everything after that is proof of its cause being the accident. Once we discovered that he actually had significant injuries, that he had difficulty treating prior to the accident, he then changed to a new theory that the accident aggravated his pre-existing injuries that he didn't tell us about. And then he concocted a different theory, which was that his injuries may have been,  to his neck, but not his neck, and to his spine, or rather to his muscles, but not his spine. Suffice it to say, none of these theories have any support, and that's the point that the court made. He resorted to theories that had no record support whatsoever. So unless your honors have any other questions, thank you for your time. Thank you, counsel. Your honors, let me just pick up where Mr. Casselaro left off. The district court dealt with many of those issues on summary judgment, and specifically in that summary judgment decision, the court found that these were fact questions that required a jury determination. Later on, in a motion in Lemony, just weeks before the trial, the court explained in a footnote that, quote, I do not, however, exclude Dr. Sherman's testimony on re-examination regarding Stenson's pre-existing injuries uncovered during the litigation. The court went further than that and permitted Cargill to call the prior lawyers to impeach Mr. Stenson's testimony, specifically because the answers to interrogatories were in dispute. Again, in the motion in Lemony order, the district court explaining that the parties dispute the authenticity of Stenson's written discovery responses. And part of what the court was relying on was the affidavit from prior counsel, which is at docket 65-3, paragraph 18, in which they admit that they were wrong to avert to the court that Mr. Stenson had sworn to some answers. So there was a lot of dispute about what he swore to or not. We understand that Cargill argued to the court that Mr. Stenson had made fraudulent statements under oath, but that was not actually a finding by the court until long after this case was dismissed. And the citation to that was simply an answer to an interrogatory that the court had earlier determined was hotly disputed, so disputed, in fact, that a jury needed to determine. Lastly, Cargill is disingenuous when they say they didn't have certification. Found in volume four of the appendix at pages 55 really through 99, you will see the record replete with Cargill having obtained certified medical records, my personal favorite, at page 99, revised hospital and provider certifications for plaintiff's counsel to submit to plaintiff's providers. Over and over again, they asked, not only did they put in their billing statements that they had certified records, they actually submitted it to the court as a part of their request for sanctions, and that was granted. So Mr. Stenson was actually sanctioned for having, when they had those certified records. Thank you for your time. That's a little bit different. You weren't attempting to submit their records. You have your own evidentiary burdens. Presumably you didn't object to theirs, you know, lacking foundation or being unreliable, right? There was a unified exhibit list, Your Honor. So you guys were in agreement on exhibits, except they reserved objections to authenticity and things like that, I'm assuming. Right. Because if they stipulated your exhibit, then we wouldn't even be here. That is correct, Your Honor. But what I'll say is that at the September 9, 2022 hearing, what happened was that the defendants, while holding the certifications, were saying that they lacked authenticity. That's what happened. But Mr. Stenson still had time to meet the court's evidentiary burden in the court, strip that opportunity away from Mr. Stenson, simply because he didn't have the witnesses then and there present, but he could have certainly if he had given the opportunity. Thank you. Thank you, counsel. Case is submitted.